UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOSE ANTONIO GARCIA MEZA, <br><br> Petitioner, <br><br> v. <br><br> MARIA ALEHANDRA AGRELLA DIAZ, <br><br> Respondent. | Case No. C15-0885RSL <br><br> MEMORANDUM OF DECISION |

This matter was heard by the Court commencing on August 3, 2015, and concluding on August 4, 2015. Jose Antonio Garcia Meza (hereinafter "father" or "Dr. Garcia") filed a petition seeking the return of his children, V.G.A. and J.A.G.A., to Venezuela pursuant to the Hague Convention of Civil Aspects of International Child Abduction ("the Convention). Respondent Maria Alehandra Agrella Diaz (hereinafter "mother" or "Dr. Agrella"), opposes the petition.

The International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 *et seq.*, implements the Convention in the United States and authorizes a person whose child has been wrongfully removed to the United States to petition a federal court to order the child returned. 42 U.S.C. § 11603(b). The Convention reflects a universal concern about the harm done to children by parental kidnaping and a strong desire among the Contracting States to implement an effective deterrent to such behavior. 42 U.S.C. § 11601(a)(l)-(4). The Convention has two main purposes: to secure the prompt return of children to the state of their habitual residence when they have been wrongfully removed and "to ensure that rights of custody and of access under the

MEMORANDUM OF DECISION

law of one Contracting State are effectively respected in the other Contracting States." <u>Asvesta v. Petroutsas</u>, 580 F.3d 1000, 1003 (9th Cir. 2006) (quoting Hague Convention, art. 1). The Convention's procedures are designed to restore the status quo prior to any wrongful removal or retention, thereby deterring parents from engaging in international forum shopping in custody cases. <u>See</u> <u>Mozes v. Mozes</u>, 239 F.3d 1067, 1070 (9th Cir. 2001). The Convention is not designed to settle custody disputes: if that were the role of the Court, this case would likely have a different outcome. Rather, the goal is to ensure that cases are heard in the proper court. <u>See</u> Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.").

## A. *PRIMA FACIA* CASE OF CHILD ABDUCTION

In order to establish a *prima facie* case of child abduction under the Convention, Dr. Garcia must show that Dr. Agrella wrongfully removed V.G.A. and J.A.G.A. to the United States in July 2014 in violation of Dr. Garcia's custody rights. The only contested element of the *prima facie* case is whether Dr. Garcia had "rights of custody" at the time the children were removed. For purposes of the Convention, rights of custody include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Art. 5(a). The Court looks to Venezuelan law to understand the nature of Dr. Garcia's rights at the time of removal and then determines whether they constitute "rights of custody" in light of the Convention's text and structure. <u>Abbott v. Abbott</u>, 560 U.S. 1, 10 (2010).

Under Venezuela's Organic Law for the Protection of Children and Adolescents, Dr. Garcia shared with Dr. Agrella the right to determine "the place of residence of their children." Dkt. # 5-1 at 47. The right to determine the children's "place of residence" means more than simply agreeing on a street address: it also encompasses decisions regarding their country of residence. 560 U.S. at 11. In <u>Abbott</u>, the Supreme Court found that the right to determine the child's country of residence also gives rise to "rights relating to the care of the person of the child." Art. 5(a).

MEMORANDUM OF DECISION                -2-

> Few decisions are as significant as the language the child speaks, the identity he finds, or the culture and traditions she will come to absorb. These factors, so essential to self-definition, are linked in an inextricable way to the child's country of residence. One need only consider the different childhoods an adolescent will experience if he or she grows up in the United States, Chile, German, or North Korea, to understand how choosing a child's country of residence is a right "relating to the care of the person of the child."

560 U.S. at 11-12. Dr. Agrella has not identified any court order or other authoritative revocation of the shared right to determine the children's place of residence. In fact, both the Organic Law and an April 2014 court order reinforce Dr. Garcia's right, specifically precluding Dr. Agrella from removing the children from the country without Dr. Garcia's consent. Dkt. # 5-1 at 48; Dkt. # 4-20 at 4-5. Having established his shared right to determine his children's place of residence, Dr. Garcia has shown that the removal of the children in July 2014 was in violation of his rights of custody and therefore wrongful under the Convention.

**B. GRAVE RISK OF HARM EXCEPTION**[1]

Once wrongful removal is shown, the children must be returned to the country in which they had habitually resided before the removal unless Dr. Agrella can establish one of the exceptions set forth in the Convention. Return is not required if the abductor can show that return would pose a "grave risk of physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). The exception is not a license for the Court to engage in a best-interests-of-the-child analysis, however: the risk must be "grave, not merely serious," and must be proven by clear and convincing evidence. Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986); 42 U.S.C. § 11603(e)(2)(A). "Moreover, because the Hague Convention provides only a provisional, short-term remedy in order to permit long-term custody proceedings to take place in

---

[1] At trial, respondent conceded that the children are too young to satisfy the mature child exception. V.G.A was born in 2007 and J.A.G.A was born in 2011. Having interviewed V.G.A., the Court agrees that the mature child exception does not apply.

MEMORANDUM OF DECISION              -3-

the home jurisdiction, the grave-risk inquiry should be concerned only with the degree of harm that could occur in the immediate future. Because psychological harm is often cumulative, especially in the absence of physical abuse or extreme maltreatment, even a living situation capable of causing grave psychological harm over the full course of a child's development is not necessarily likely to do so during the period necessary to obtain a custody determination." Gaudin v. Remis, 415 F.3d 1028, 1037 (9th Cir. 2005).

Dr. Agrella has accused Dr. Garcia of sexually abusing V.G.A. and asserts that their daughter will suffer physical and psychological harm if forced to be in Dr. Garcia's presence. While there is clear and convincing evidence that V.G.A. has been sexually abused, whether Dr. Garcia is the perpetrator and therefore poses a risk to his daughter is not at all clear. Dr. Agrella's testimony regarding when she became aware that her husband had abused V.G.A. and why she did not reveal that information to the authorities when she reported the abuse is hard to reconcile and suggests a developing story arc that may have been motivated by personal animus. The accusations came soon after Dr. Garcia admitted being unfaithful, prompting Dr. Agrella to say that she would ruin his life. It is plausible that Dr. Agrella had ulterior motives for blaming the abuse on her husband. The Venezuelan authorities that carefully reviewed the evidence twice dismissed the charges against Dr. Garcia.[2] Respondent has failed to make a clear and convincing showing that Dr. Garcia is the person who abused V.G.A. or that she will suffer physical or psychological harm if returned to Venezuela for a custody determination.

Dr. Agrella also argues that both children will suffer psychological harm if they are separated from their mother. Although the Court does not underestimate the emotional and psychological upheaval that result when a child is separated from his or her parent, the mere fact of separation across international boundaries cannot be enough to satisfy the grave risk

---

[2] Dr. Agrella's suggestions that Venezuela systematically fails to investigate allegations of abuse or protect victims and that Dr. Garcia somehow engineered the dismissal of the charges against him are not supported by the record.

MEMORANDUM OF DECISION                    -4-

exception. Such separation is a possibility in virtually all Hague Convention cases. If separation from the primary caregiver were deemed sufficient evidence of a grave risk, "the purposes of the Convention would be largely frustrated. Parents could carry their children across international borders to obtain an advantage in custody disputes and then defeat return under the Convention by virture of the fact that return would be traumatic for the child." Aguilera v. De Lara, 2014 WL 3427548, at *5 (D. Ariz. July 15, 2014). See also Charalambous v. Charalambous, 627 F.3d 462, 469-70 (1st Cir. 2010) ("The district court correctly concluded that 'the impact of any loss of contact with the Mother is something that must be resolved by the courts of the Children's habitual residence.'"); England v. England, 234 F.3d 268, 270-72 (5th Cir. 2000) ("Courts considering this issue have uniformly found considerations such as [separation from the mother or the unsettling effects of return to the country of habitual residence] inapposite to the 'grave risk' determination."); Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir. 1995) ("The district court incorrectly factored the possible separation of the child from his mother in assessing whether the return of the child to Mexico constitutes a grave risk that his return would expose him to physical or psychological harm or otherwise place him in an intolerable situation."). The Court declines to equate separation from a caregiver, without more, with a grave risk of physical or psychological harm.

**C. UNDERTAKINGS**

Article 18 of the Convention reserves to the Court the discretionary power to order return of the child at any time, notwithstanding the other provisions of the treaty. Lozano v. Montoya Alvarez, __ U.S. __, 134 S. Ct. 1224, 1237-38 (2014) (Alito, J., concurring). In determining whether to exercise this discretion, courts generally evaluate whether there are arrangements - commonly called "undertakings" - that could be made that would allow the prompt return of the children to their home jurisdiction for a custody determination while mitigating any potential for short-term harm. See Simcox v. Simcox, 511 F.3d 594, 610 (6th Cir. 2007); Gaudin, 415 F.3d at 1036; Walsh v. Walsh, 221 F.3d 204, 219 (1st Cir. 2000); Blondin v. Dubois, 189 F.3d 240, 249

MEMORANDUM OF DECISION            -5-

(2nd Cir. 1999); <u>Feder v. Evans-Feder</u>, 63 F.3d 217, 226 (3rd Cir. 1995). Although respondent has failed to show a grave risk of harm to the children, Dr. Garcia recognizes that he has virtually no relationship with his children at this point in time and is willing to undertake certain actions to ameliorate the emotional, psychological, and physical upheaval that will necessarily arise if return is ordered. Dr. Garcia has agreed to pay for the children and at least one caregiver's airfare to Venezuela and will confine himself to supervised visits with the children until the Venezuelan courts make a custody/visitation determination.

Dr. Garcia also indicated that his wife and children could return to the same apartment they inhabited before they left Venezuela. There is a warrant out for Dr. Agrella's arrest, however, which would likely deprive the children of their primary caregiver for some unknown period of time (assuming Dr. Agrella is willing to risk arrest by returning to Venezuela at all). According to the testimony at trial, the warrant was issued after the third unsuccessful attempt to serve summons in a slander case initiated by Dr. Garcia. To the extent possible without violating a court order, subpoena, or other duty imposed by law, Dr. Garcia shall refrain from affirmatively pursuing the slander action and shall promptly notify the prosecutor of that intent. The quashing of the warrant and/or dismissal of the slander action are not, however, prerequisites to the return of the children to their country of habitual residence.[3]

The Court finds that these narrowly-focused undertakings do not offend notions of international comity and are appropriate to ameliorate any risk of harm to which the children may be exposed before the Venezuelan courts can make a long-term custody determination.

---

[3] The Court is aware of Dr. Agrella's pending asylum application, but has not attempted to account for this additional complexity. Whether Dr. Agrella chooses to remain in the United States so as not to jeopardize her application is entirely her choice, and whether the application will be granted or denied falls within the purview of the executive branch. Because enforcement of the Convention cannot be voided or forestalled by the initiation of parallel administrative proceedings, the pending asylum application has had no impact on the outcome of Dr. Garcia's petition.

MEMORANDUM OF DECISION              -6-

For all of the foregoing reasons, it is hereby ORDERED that the petition for return of V.G.A. and J.A.G.A. is GRANTED. The children's passports shall be released to petitioner (or petitioner's counsel) seven days from the date of this Order, and the children shall be forthwith returned to Venezuela, their country of habitual residence. This Order is subject to the following undertakings:

1. Petitioner shall, as soon as practicable, notify the prosecutor that he does not intend to pursue the slander charges against respondent and take any steps that would facilitate the quashing of the warrant and/or the dismissal of the charges. Petitioner is not, however, required to make any statement or take any action that violates a court order, subpoena, or other duty imposed by law in order to bring about the quashing of the warrant and/or the dismissal of the criminal charges.

2. Petitioner shall purchase airfare for the children and at least one caregiver to fly from Seattle to Venezuela.

3. Until the Venezuelan courts make a final custody determination and consistent with his representations to the Court, petitioner's visits with the children shall be supervised.

Dated this 2nd day of September, 2015.

*MRS Lasnik*
Robert S. Lasnik
United States District Judge

MEMORANDUM OF DECISION            -7-